UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES SLENCZKA, ET AL.,

       Plaintiffs,

v.

CENTRAL STATES, S.E. & S.W. AREAS
PENSION FUND, ET AL.,

       Defendants.
_____/

Case No. 03-74257

Honorable Nancy G. Edmunds

**ORDER GRANTING MOTION FOR JUDGMENT ON
THE ADMINISTRATIVE RECORD [55]**

In this case, Plaintiffs challenge the Defendant pension and benefit funds' decision not to accept a collective bargaining agreement that Plaintiffs reached with their employer. Defendants contend that their decision was required to protect the economic health of the funds because Plaintiffs' employer was engaged in "adverse selection"--a hiring scheme that limits the number of young employees to pay into the Funds while a relatively large number of older employees continues to draw out of them. Defendants argue that the decision is protected by ERISA.

For the reasons discussed below, the Court GRANTS Defendants' Motion for Judgment on the Administrative Record.

**I.    Background**

Plaintiffs are employees of Landstar Ranger, Inc. ("Landstar"), a trucking company. Plaintiffs are classified as "owner-operators," meaning that Landstar pays them for their services and for use of their trucking equipment. Owner-operators are covered by

successive collective bargaining agreements between their union and Landstar, and until recently, were vested participants in the two Defendant Funds: Central States, Southeast and Southwest Areas Pension Fund ("Pension Fund") and Central States, Southeast and Southwest Areas Health and Welfare Fund ("Health and Welfare Fund") (collectively, "the Funds").

Both Funds are governed by Trust Agreements ("the Trusts"), which grant substantial discretion to the Trustees in decisions affecting the health of the Funds and the ability to meet the needs of Fund fiduciaries. As the Trusts make clear,

> The Trustees are . . . authorized to formulate and promulgate any and all necessary rules and regulations which they deem necessary or desirable to facilitate the proper administration of the Trust. . . . The Trustees are vested with discretionary and final authority in adopting rules and regulations for the administration of the trust fund.

(Br. of Defs. Ex. B p. 13, Ex. C p. 11.) Specifically, the Trustees have the authority "to reject any collective bargaining agreement of an Employer . . . whenever they determine . . . that the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund[s] . . . ." (*Id.* at Ex. B p. 7, Ex. C p. 7.)

The Trusts impose an "adverse selection rule" on participating employers, which prevents them from "manipulat[ing] their workforce so that participation in the Pension Fund is limited to only those individuals who are most certain to obtain a vested pension and receive the highest pension benefits," and "manipulating the workforce so that participation in the Health and Welfare Fund is limited to those whose claims will, on average, be higher than the norm." (*Id.* at Ex. A ¶27-28.) The purpose of this rule is to ensure that the Funds' incoming contribution rates are sufficient to support the outgoing benefit obligations, as

2

these numbers are determined by actuaries. "[T]he actuaries assume that retiring members will be replaced by new members whose contributions will help fund the benefits paid to the retirees." (*Id.* at Ex. A ¶30.) "Without contributions on all employees (including the younger employees with little or no credit with the Funds), the actuarial assumptions are unsound and there may not be sufficient assets to pay promised benefits." (*Id.* at Ex. A ¶29.)

Prior to the 1995-1999 collective bargaining agreement, the Funds investigated Landstar for possible violations of the adverse selection rule. (Supp. Br. of Defs. Ex. D p. 82, Ex. E p. 274.) The Funds noted that from 1991 to 1994, Landstar had reduced the number of employees for which it remitted Fund contributions from 309 to 165. (*Id.*) The apparent reason for this decline was Landstar's shift away from owner-operators, such as Plaintiffs, and toward "non-employee owner-operators." (*Id.*) "Non-employee owner-operators" (also called "business capacity owners"), are explicitly excluded from participation in the Funds. Landstar indicated at the time that because employee owner-operators are inherently more expensive than non-employee owner-operators, it was not economically feasible to continue to hire employee owner-operators. (*Id.*)

New hires are typically younger and healthier than veteran employees, and therefore tend to pay the most into the funds in relation to the amount they draw out. Because Landstar was shifting away from employee owner-operators, however, its new hires were not contributing to the Funds. The veterans, on the other hand, continued contributing into the Funds, but were also drawing out a disproportionate amount of money. The result of this structural shift at Landstar was a change in the ratio of "contributing" employees to "beneficiary" employees. Because the Funds were designed by actuaries with the

understanding that young employees will pay older employees' way, a deficiency of young employees in relation to older employees put the health of the Funds in jeopardy.

The Trustees responded by approving the termination of Landstar's participation in the Funds, effective February 1, 1995.  (*Id.*)  After negotiations, however, Landstar agreed to a number of concessions, including the requirement that all new hires would participate in the Funds, and that Landstar would make its best efforts to hire 15 new employees, replace outgoing employee owner-operators with new employees of the same designation, and increase the number employees participating in the Funds and maintain a level of at least 222.  (*Id.* at Ex. D p. 83, Ex. E p. 275.)  If Landstar was unable to meet this target of 222, it agreed to contribute to the Pension Fund at a total level of 175 employees.  (*Id.)*  Based on these concessions, the Trustees agreed to renew Landstar's collective bargaining agreement covering the years 1995-1999.  (*Id.*)

By September of 2000, however, the number of Landstar employees participating in the Funds had dropped to 80.  (*Id.*)  An actuary for the Funds determined that the average age of participating Landstar employees was 56.6 years, whereas the average for the Pension Fund overall was 43.6 years.  (*Id.* at Ex. D p. 90, Ex. E p. 282.)  Moreover, participating Landstar employees' average contributory credit--the number of years of work, for they are entitled to pension benefits--was 19.3 years, while the Pension Fund average was only 12.5 years.  (*Id.*)  Thus, compared with other fund participants, Landstar was enlisting fewer younger (and healthier and more productive) employees into the funds, while its number of older employees remained disproportionately high.

In its 2000-2005 collective bargaining agreement, Landstar omitted the concessions that it had made in 1995, upon which the Trustees based their acceptance of the previous

4

collective bargaining agreement.  (*Id.* at Ex. D p. 84, Ex. E p. 276.)  Based on this omission, and based on Landstar's disproportionately high ratio of aging employees to young employees and its failure to resolve this problem, the Trustees voted to reject Landstar's 2000-2005 collective bargaining agreement.  (*Id.* at Ex. D p. 85, Ex. E p. 277.)

Plaintiffs filed a group administrative appeal, which the Funds denied.  This litigation ensued.

## II.     Standard of Review

A *de novo* standard of review applies to decisions by ERISA plan administrators "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Where an ERISA benefit plan gives the plan administrator discretionary authority to determine benefit eligibility or to interpret the terms of the plan, the administrator's decision is reviewed under the deferential "arbitrary and capricious" standard.  *Marquette Gen. Hosp. v. Goodman Forest Indus.*, 315 F.3d 629, 632 (6th Cir. 2003).  Under the arbitrary and capricious standard, a court should uphold the trustees' decision as long as it is rational in light of a plan's provisions.  *Id.*

Plaintiffs state in their brief that "the statutory and fiduciary claims require *de novo* review . . . ."  (Br. of Pls. at 11.)  Plaintiffs' argument presumably rests on the notion that this is not a "garden variety benefit determinations case[]" under Section 1132(a)(1)(B) of ERISA.  (*Id.* at 8.)

Plaintiffs do not allege that the Funds wrongfully denied a particular claim for benefits, but that the Funds wrongfully denied their participation in the Funds altogether.  As the Funds point out, however, the relevant inquiry--the question that separates benefits

5

claims from fiduciary duty claims--is whether Plaintiffs are asserting claims on behalf of themselves or on behalf of all participants in the Funds. Here, the remedies that Plaintiffs seek would ostensibly *harm* the Funds and their other participants, and thus are not fiduciary duty claims. Thus, despite Plaintiffs' attempt to color this case differently, their claims are for benefits to themselves, albeit future ones. Moreover, while Plaintiffs do not base all of their claims on Section 1132(a)(1)(B), their claims all stem from the same conduct: the Funds' decision not to accept Landstar's collective bargaining agreement, and therefore to deny Plaintiffs' future claims for benefits as long as they work for Landstar.

The Sixth Circuit has "f[ou]nd no barrier to application of the arbitrary and capricious standard in a case . . . not involving a typical review of denial of benefits." *Hunter v. Caliber Systems*, 220 F.3d 702, 711 (6th Cir. 2000). In fact, two cases addressing very similar claims against the same Funds have applied the arbitrary and capricious standard. In one case, another district court ruled as follows:

> Here, the provisions of the Trust Agreement . . . give the trustees broad discretion to make decisions on issues of participation. Further, trust law principles dictate that the trustees of a plan who are vested in the first instance with the power to make participation decisions in the best interests of the plan beneficiaries are due substantial deference based upon their expertise and their having been selected precisely to make those types of decisions. In short, . . . the nature of the decision under review and the language of the Trust Agreements both support the . . . position that review of the decisions at issue in this case should be under the deferential arbitrary and capricious or abuse of discretion standard.

*Slye v. Central States Southeast & Southwest Areas Health & Welfare Fund*, 1996 U.S. Dist. LEXIS 22217, *41 (D. Ohio Nov. 22, 1996). In another case, the Eighth Circuit held, "Once it is determined that the trustees have the authority to reject payments [from an employer] under the terms of the relevant documents, our review of the propriety of their

actions in rejecting the payments is limited to a determination of whether the trustees' decision is arbitrary, capricious, or an abuse of discretion." *Central Hardware Co. v. Central States, Southeast & Southwest Areas Pension Fund*, 770 F.2d 106, 109 (8th Cir. 1985).

For the same reasons, the arbitrary and capricious standard applies in this case as well. The Trusts explicitly granted the Trustees discretion to exclude an employer from participating in the Funds for the reasons at issue here, and this Court is limited to reviewing whether the Trustees' decision was arbitrary and capricious or was an abuse of their discretion.

Because this Court reviews the Funds' decision under the arbitrary and capricious standard, it is concerned only with whether the Trustees' decision was reasonable at the time. The Court's review is therefore limited to the administrative record.

### III.   Discussion

####   A.   Count I

In Count I of the Complaint, Plaintiffs rely on Section 502(a)(1)(B) of ERISA to argue that they "have had their valuable rights and accrued benefits . . . unjustifiably diminished." (Compl. at 15.) In support of this claim, Plaintiffs argue that the Funds' adverse selection policy is not grounded in sound actuarial principles and that the Funds have failed to prove any adverse selection on the part of Landstar.

The Seventh Circuit has discussed the reasoning behind adverse selection policies as follows:

> Plans rely on documents to determine the income they can expect to receive, which governs their determination of levels of benefits. Multi-employer plans are defined-contribution in, defined-benefit out. Once they promise a level

> of benefits to employees, they must pay even if the contributions they expected to receive do not materialize. . . .
>
> An employer wants some of its employees to have pension and health benefits, and others not. Some may be only a few years away from vesting. Pension and welfare trusts, like insurers generally, want to avoid "adverse selection," the dropout of persons safer or younger than the pool's average. Funds insist that members of a group be in or out as a bloc: the fund cannot cover the old and infirm at a rate computed from group averages while receiving nothing on behalf of younger employees. Employers often strongly wish it were otherwise. Local unions may not care about selective inclusion in pension plans (since the costs are borne by employers in other parts of the country), and from their perspective having some workers covered is better than having none. So the local and the employer sign a collective bargaining agreement and send it to the pension and welfare trusts.

*Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1151-1152 (7th Cir. 1989) (en banc). To avoid being stuck with such adverse selection problems, the Funds devised the adverse selection rule at issue in this case.

In *Central Hardware Co.*, which involved the same issue now facing this Court, the Funds argued that "allowing [the plaintiff] to make payments to the fund only on behalf of employees hired prior to May 19, 1982, would seriously threaten the actuarial soundness of the fund." 770 F.2d at 110. The Funds noted there, just as they do here, that it is a "universal actuarial assumption . . . that the contributions of new members who replace retiring members will be used in part to pay the benefits due retired members . . . . Thus, if no new members enter the group, benefit funds will run out before all the benefits due to retirees based on their life expectancies are paid off." *Id.*

The Eighth Circuit first held that the Funds had authority to make this determination: "In an effort to carry out their obligation to protect the trust fund and assure a continuation of benefit payments, the trustees have decided to reject the tendered payments. The

8

trustees' determination that they have the authority to so act is not only supportable by a construction of the governing documents but is entitled to significant weight." *Id.*

Next, the Court concluded that under the arbitrary and capricious standard, "the trustees acted reasonably under the circumstances":

> The evidence is uncontradicted that the absence of payments by employers on behalf of new hires would expose [the Funds] to a substantial unfunded benefit liability. . . .  With [the plaintiff's] actions operating to threaten the actuarial soundness of [the Funds], and with the actuarial soundness of [the Funds] being "essential to its ability to pay benefits to participants and their beneficiaries," it was reasonable for [the Funds] to reject the payments tendered by [the plaintiff].  Additionally, we note that [the Funds'] rejection of [the plaintiff's] tendered payments is consistent with its policy of rejecting actions that threaten its actuarial soundness, and with its obligation under ERISA to act solely in the interest of and for the exclusive purpose of providing benefits to the participants and beneficiaries.

*Id.* at 110-111 (internal citations omitted).

Plaintiffs present no evidence in support of their contention that "[t]his simply is not how actuaries go about their business" (Br. of Pls. at 12).  Indeed, as the above discussion demonstrates, courts have recognized the soundness of the adverse selection rule at issue here.

Plaintiffs also argue that the Funds cannot prove adverse selection on the part of Landstar.  The factual background makes clear, however, that Landstar chose to focus its hiring practices on non-employee owner-operators who would not contribute into the Funds. The Funds' actuaries determined that the actuarial characteristics of the remaining Landstar participants were unfavorable to the health of the Funds, when compared with the norm for the Funds.  Finally, Landstar omitted from its 2000-2005 collective bargaining agreement certain provisions that had sought to protect the Funds from actuarial harm.

Plaintiffs' respond by noting that "the ages and years of service *of the suspect group* are not investigated" by the Funds. (Br. of Pls. at 14 (emphasis in original).) Plaintiffs have a valid point: If the non-employee owner-operators that Landstar is hiring are no younger and no less infirm than the employee owner-operators working for Landstar, then the effect of Landstar's hiring practices may not be to disadvantage the Funds. But common sense-- upon which the Funds were entirely justified in relying--dictates that in the aggregate, new hires are younger and healthier than veteran employees. Thus, it was not arbitrary and capricious or an abuse of discretion not to investigate the actual ages and years of service of the non-employee owner-operators.

Because the Funds were justified in relying upon the adverse selection rule and enforcing that rule on Landstar, the Funds' decision not to accept Landstar's collective bargaining agreement was not arbitrary or capricious or an abuse of discretion.

### B.  Count II

In Count II of the Complaint, Plaintiffs argue that the Trustees have breached their fiduciary duty under Section 404(a)(1) of ERISA. Plaintiffs' argument appears to be based on the idea that the Trustees breaching their fiduciary responsibilities to the Funds by discriminating against Plaintiffs on the basis of age. As the discussion above demonstrates, however, the Funds' adverse selection policy is a justifiable means to *protect* the health of the Funds, albeit perhaps at the expense of some individual members.

Plaintiffs recognize that "ERISA does not expressly forbid discrimination on the basis of age . . . ." (Pls. Br. at 17.) Plaintiffs argue, however, that "individuals who were excluded from further plan participation solely on the basis of their age after they have acquired substantial credit toward their benefit have what has been called a 'protectible interest.'"

10

(*Id.*)  But *Plaintiffs* were not "excluded from further plan participation solely on the basis of their age." Their *employer* was excluded on the basis of its failure to include younger workers in the participation of the Funds.  Indeed, the Trustees make perfectly clear that they "did not bar these Plaintiffs from continuing to earn credit or coverage with the Funds under any and all circumstances.  Rather, the Trustees only determined that these Plaintiffs could not continue to earn credit while working for an employer who persistently refused to abide by the Funds' participation rules."  (Repl. Br. of Defs. at 1.)

While the Trustees' decision not to accept Landstar's collective bargaining agreement had an obvious adverse impact on Landstar employees, it benefitted the Funds overall--including Plaintiffs, so long as they found work with an employer who complied with the Funds' guidelines.  The Trustees have not violated their fiduciary duties to the Funds.

    **C.**    **Counts III and IV**

In Count III, Plaintiffs claim that the Funds have engaged in "impermissible funding methods," relying on 26 C.F.R. § 1.412(c)(3)(d)(2).  The Funds contend that Plaintiffs have misread this regulation, which has no application to actuarial assumptions for purposes of this case.

In Count IV, Plaintiffs rely on the Section 411(b)(1)(G) of the Internal Revenue Code to argue that the Funds impermissibly discriminate on the basis of age.  The Funds point out that this statute merely prohibits Plaintiffs' accrued benefits from *decreasing*, but says nothing about whether the ability to accrue benefits can be halted, as has happened here.

In their Response Brief, Plaintiffs abandon each of these arguments, apparently conceding that they are misplaced.

    **D.**    **Count V**

In Count V, Plaintiffs claim that the Funds violated Section 510 of ERISA, which prohibits "any person" from discriminating against an ERISA plan participant's ability to attain benefits to which he or she is entitled. Section 510 states in pertinent part,

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an ERISA plan] . . . .

29 U.S.C. § 1140.

Many courts limit Section 510 to employers, finding that the language of this statutory section suggests that the legislature did not intend for it to apply beyond the employment relationship. *See, e.g., Teumer v. General Motors Corp.*, 34 F.3d 542, 544 (7th Cir. 1994) ("§ 510 protects *employment relationships* from disruptions designed to frustrate the vesting of benefit plan rights or the continued enjoyment of rights already vested but yet to be partaken") (emphasis added). The Sixth Circuit, however, has held that Section 510 "reaches further than the employment relationship," and that a widow could seek recovery from her late husband's estate under this provision. *Mattei v. Mattei*, 126 F.3d 794, 804 (6th Cir. 1997). The Sixth Circuit has not applied Section 510 to a pension fund, but relying on *Mattei*, Plaintiffs argue that "the trustees of a benefit plan are 'persons' with respect to Section 510 and that defendants' [sic] intentionally terminated plaintiffs' participation in order to prevent them from acquiring Class 18 early retirement pensions." (Br. of Pls. at 20.)

Even assuming that the Funds are "persons" for purposes of Section 510, Plaintiffs cannot show that the Funds discriminated against them for the purpose of interfering with their attainment of a benefit to which they are entitled under ERISA. The Trustees' decision

not to accept Landstar's collective bargaining agreement was based not on a desire to prevent Plaintiffs from receiving benefits, but on a desire to ensure that the Funds remain adequately funded for all participants. See *Mattei*, 126 F.3d at 805 ("'[Section 510] does not broadly forbid all forms of discrimination' in employment benefits, only discrimination 'designed to retaliate for the exercise of a right or to interfere with the attainment of an entitled right'") (quoting *Owens v. Storehouse, Inc.*, 984 F.2d 394, 398 (11th Cir. 1993).) Moreover, for the reasons discussed in the foregoing sections, Plaintiffs are not "entitled" to ERISA benefits if they work for Landstar.

## IV.  Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby GRANTS Defendants' Motion for Judgment on the Administrative Record.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  July 20, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 20, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

13